Filed 10/3/14  Certified for Publication 11/3/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| ASPEN GROVE CONDOMINIUM ASSOCIATION, | |
| Plaintiff and Respondent, | C073530 |
| v. | (Super. Ct. No. SCV0023959) |
| CNL INCOME NORTHSTAR LLC et al., | |
| Defendants and Appellants. | |

This appeal concerns a water retention basin that was dug in 2004 as part of an expansion project for Northstar Village, a ski resort.  The ski resort is owned by CNL Income Northstar LLC and operated by Trimont Land Company (sometimes collectively referred to as CNL).  The retention basin was deemed necessary because the expansion project changed the drainage system that diverted storm and snow runoff from approximately 149 acres of developed property.  Nearby and downhill from the retention basin are 180 condominium units owned by Aspen Grove Condominium Association (Aspen Grove).  Water from the retention basin began to overflow and seep onto Aspen Grove's property starting in December 2004 and continuing thereafter despite remediation efforts.  After several years of attempts to solve the water problems with the

1

retention basin, CNL communicated to Aspen Grove in 2008 that it would not perform any further remedial modification or remove the retention basin.

Aspen Grove responded by suing various entities involved in the Northstar Village expansion project, including CNL. The first phase of the bifurcated trial resulted in the trial court's granting a permanent injunction that requires CNL to remove the retention basin. In this appeal in which we address only the first phase of the bifurcated trial, CNL challenges the mandatory injunction on grounds (1) the trial court erred in admitting evidence of damage to the trees on Aspen Grove's property, (2) the trial court should have excluded evidence gathered after the discovery cutoff date, (3) Aspen Grove was not entitled to a mandatory injunction because it has an adequate remedy at law in the form of monetary damages and the option of building a trench on its own property to divert the water overflowing from the retention basin, and (4) the mandatory injunction is overbroad in requiring removal of the retention basin.

We conclude CNL has not preserved its evidentiary arguments because CNL did not include them as issues for appeal when designating a partial reporter's transcript. The trial court did not err in concluding Aspen Grove had no adequate remedy at law because only removal of the retention basin would alleviate the continuing damage to Aspen Grove's property. To hold otherwise would grant a private property owner the right to condemn his or her neighbor's property by limiting the legal remedy for continuing trespass to monetary compensation. The trial court's injunctive relief, rather than being overbroad, rests on credible evidence that removal of the retention basin would prevent irreparable harm to Aspen Grove's property. As a result, we affirm.

FACTUAL AND PROCEDURAL HISTORY

*A Retention Basin Directly Uphill from Aspen Grove*

In November 2008, Aspen Grove filed a complaint stating causes of action for diversion of surface water, negligence, trespass, and nuisance. A fifth cause of action for mandatory injunction incorporated the other causes of action. Without objection, the trial

2

court bifurcated trial with the first phase limited to injunctive relief, equitable issues, and the question of whether Aspen Grove's action was timely. During the three-week trial of the first phase, CNL designated almost 600 trial exhibits, more than 240 exhibits from the parties were admitted into evidence, and the trial court heard from at least 18 witnesses.

The trial court issued a statement of decision in which it noted that "[t]here is little, if any dispute as to the underlying facts." CNL does not challenge the sufficiency of the evidence for any of the findings made by the trial court. Consequently, we summarize briefly the factual background of this case.

In 2004, an expansion project was undertaken for Northstar Village by then-owner Northstar Mountain Properties LLC along with affiliated entities including East West Partners, Inc. and East West Partners-Tahoe, Inc.[1] The expansion project added approximately 681,000 square feet of new buildings, driveways, and parking lots. As part of the expansion project, a water retention basin was constructed to collect low flow drainage from the entire 149-acre watershed –- including the newly developed acres of impervious surface improvements such as buildings, driveways, and parking lots.

The retention basin was constructed to be partially lined. It is located uphill and only 120 feet away from Aspen Grove's nearest condominium building. No geotechnical investigation of groundwater levels at the location of the retention basin or downhill on the Aspen Grove property was undertaken –- even though the developer had knowledge of high groundwater levels in the areas. During excavation of the retention basin, high groundwater and water seepage was encountered. Although the retention basin had been planned to have a 58,152 cubic foot capacity, it was constructed with only a 19,074 cubic foot capacity.

---

[1]     Although originally named as defendants in the complaint, Northstar Mountain Properties LLC, East West Partners, Inc., and East West Partners-Tahoe, Inc. are not parties to this appeal. For ease of reference, we refer to them collectively as NMP.

3

During the winter of 2004 and spring of 2005, the retention basin overflowed and seeped water onto Aspen Grove's property. Temporary measures were taken to abate the water problem by using sand bags, pumping equipment, and making some modifications to the basin. In response, the developer deepened the retention basin and raised the berm. But to no avail; the pond continued to retain large amounts of water that infiltrated Aspen Grove's property throughout 2005.

From 2005 until 2007, Northstar Village was owned and operated by Trimont. In January 2007, CNL assumed ownership of Northstar Village. Trimont continued operating the property. Even after the changes of ownership, it appears that NMP –- which was the developer for the 2004 Northstar Village expansion –- continued with its efforts to remediate the retention basin.

In 2007, NMP installed an interceptor trench to remove elevated groundwater and control seepage into Aspen Grove's nearby condominium. The interceptor drain, however, proved ineffective at preventing ongoing water damage to Aspen Grove's property.

Also in 2007, the County of Placer required changes to the retention basin because "the pond size is marginal" and "the design of the retention basin does not provide its intended function" due to "the basin [being] too deep and has a small footprint that doesn't allow enough infiltration."

In February 2008, NMP submitted to the County of Placer a "drainage report" that recognized "water levels within the retention pond affect the depth to groundwater down gradient from the pond." To alleviate the problem, NMP proposed a high-flow bypass system so that 56 percent of flows to the retention basin "could be redirected through other water quality treatment facilities instead of through the pond which would enhance the performance of the pond." Also proposed was a "low-flow outlet in the bottom of the pond" so that the drawdown time would be approximately 12 hours.

4

In response to the high-flow bypass and low-flow outlet proposed in the drainage report, Aspen Grove expressed concerns about their effectiveness and asked NMP to install a monitoring system. Aspen Grove thus requested that NMP install three or four piezometers –- narrow wells used to monitor the depth of the groundwater –- on the Aspen Grove property.

In "the late winter of 2008," representatives of Aspen Grove met with representatives of NMP and an engineer for the County of Placer. They discussed the proposed high-flow and low-flow mitigation measures. The Aspen Grove representatives voiced concerns about the effectiveness of the proposed measures and asked NMP to prepare a contingency plan in the event the mitigation measures failed. NMP's "response was if this doesn't work then sue us."

The modifications to the retention basin did not accomplish their purpose, and the basin continued to leak water onto the Aspen Grove property. In November 2008, a monitoring report noted that "[t]he low flow drain doesn't seem to keep up with the continuous flow into the pond and now the level has risen [in the retention basin] and more infiltration is occurring." There was no observable change in overall conditions on Aspen Grove property when compared to those observed before the mitigation measures were installed for the retention basin.

### *The Trial Court Issued a Permanent Injunction Requiring Removal of the Retention Basin*

In November 2008, Aspen Grove filed a complaint against NMP, CNL, and Trimont. Trial was bifurcated into two phases: The first phase addressed Aspen Grove's claim for injunctive and equitable relief, and the second phase was slated to focus on legal claims and defenses to be tried by a jury. Trial of the first phase resulted in the trial court's issuance of an interlocutory judgment in which it granted a permanent injunction that requires CNL to remove the retention basin, subject to approval of governmental agencies charged with overseeing water quality and management issues.

*Notice of Appeal and Designation of the Appellate Record*

After entry of the interlocutory judgment granting the permanent injunction, CNL and Trimont timely filed a notice of appeal. CNL and Trimont thereafter filed a designation of the appellate record in which they specified that a partial reporter's transcript be prepared.

## TRIMONT'S CAPACITY TO APPEAL

Aspen Grove has filed a partial motion to dismiss the appeal in which it asserts Trimont lacks capacity to appeal as a corporation suspended for failure to pay its taxes. Revenue and Taxation Code section 23301 provides that corporate powers, rights, and privileges of a domestic corporation are suspended if the corporation fails to pay its taxes. (See *Peacock Hill Assn. v. Peacock Lagoon Constr. Co.* (1972) 8 Cal.3d 369, 371 & fn. 1.) However, corporate powers may be revived upon payment of the delinquent taxes. (*Ibid.*) Here, Trimont has submitted a certificate from the California Secretary of State to demonstrate Trimont has regained its good standing with the Franchise Tax Board. Consequently, Trimont has reassumed capacity to appeal. (*Id.* at pp. 373-374.)

## DISCUSSION

## I

### *Admission of Evidence Concerning Damage to Aspen Grove's Trees and Evidence Gathered after the Discovery Cutoff Date*

CNL challenges the evidentiary rulings of the trial court (1) admitting evidence of damage to the trees on Aspen Grove's property, and (2) admitting evidence gathered by Aspen Grove after the discovery cutoff date. In its partial motion to dismiss the appeal, Aspen Grove points out CNL did not include these issues in its specification of arguments to be raised on appeal. The point is well taken.

CNL elected to proceed with a partial reporter's transcript. When an appellant "designates less than all the testimony," California Rules of Court, rule 8.130(a)(2) provides that "the notice must state the points to be raised on appeal . . . ." The

6

consequence of the statement of points to be raised on appeal is that "the appeal is then limited to those points unless, on motion, the reviewing court permits otherwise." (*Ibid.*)

CNL designated a partial reporter's transcript and specified the issues to be raised on appeal as: "(1) The granting of the mandatory injunction was not supported by sufficient evidence; (2) The granting of the mandatory injunction was against law; (3) The granting of [the] mandatory injunction was improper because Respondent has an adequate remedy at law; (4) The granting of the mandatory injunction was improper because Appellants lack the ability to comply; (5) The granting of the mandatory junction exceeded the scope of the relief prayed for by [Respondent]; (6) The granting of the mandatory injunction was improperly broader than necessary to provide the relief prayed for by [Respondent]; (7) Appellants did not waive their constitutional right to a jury trial to determine liability in the first instance."

None of these seven specified issues expressly or impliedly encompasses claims the trial court erred in admitting evidence introduced by Aspen Grove. CNL's lack of notice as to claims of error in admission of Aspen Grove's evidence comports with CNL's failure to designate the trial court's oral ruling on their objections to testimony of Aspen Grove's arborist, Randall Frizzell, or Frizzell's actual testimony. CNL also did not designate the trial court's ruling on CNL's motion in limine seeking to exclude post-discovery exhibits.

We will not consider a contention not included in the specification of points to be raised in an appeal in which the appellant proceeds by partial transcript. (*McDaniel v. Dowell* (1962) 210 Cal.App.2d 26, 30; see also *Wickham v. Southland Corp*. (1985) 168 Cal.App.3d 49, 52, fn. 2.) We reject CNL's request to consider the omitted issues on grounds public policy favors resolution of appeals on the merits. The policy in favor of deciding appeals on their merits is not undermined by holding CNL to its own choice of

7

issues to raise on appeal. Thus, we conclude CNL has not preserved for appeal the evidentiary issues concerning admission of Aspen Grove's evidence.[2]

## II

### *Aspen Grove's Entitlement to Permanent Injunctive Relief*

CNL contends the trial court erred in ordering the removal of the retention basin when Aspen Grove had an adequate remedy at law in the form of money damages and the option to build an interceptor trench on its own property. In a related argument, CNL contends the trial court's injunction was "overbroad" because it required removal of the retention basin. We reject the contentions.

### A.

### *CNL's Proposed Remedies and Trial Court Findings*

Rather than removing the retention basin, CNL proposes that Aspen Grove construct a trench to divert the water from further damaging the foundations of the condominiums on the Aspen Grove property. Preliminary plans indicate the proposed trench would be 941 feet long and vary in depth between 9 and 16 feet. Actual trench depth would depend on how far below the surface the bedrock lies. One proposal for the trench would start on CNL's property, with most of the trench located on Aspen Grove's property. A second proposal would place the entirety of the trench on Aspen Grove's land in the event CNL refused to allow the trench on its property.

At trial, Aspen Grove's engineering geologist, Tom Crosby, noted the trench "is intended to remove or lower the groundwater levels downgradient from the retention basin so that it minimizes the impacts downgradient." When asked whether he thought

---

[2] Accordingly, CNL and Trimont's motion and request for this court to permit evidentiary arguments made in appellants' opening brief is denied. We also deny Aspen Grove's partial motion to dismiss even though the points regarding failure to preserve the evidentiary issues for appeal are well taken. Rather than dismissing CNL's appeal in part, we deem the evidentiary issues not properly preserved for our review.

the trench would accomplish its intended purpose, Crosby replied: "I don't think we would be 100 percent confident that the interceptor trench would do as it is intended. [¶] These are complex structures and there could still despite all of the design and study, it still may not be effective at allowing the area to go back to the natural conditions that occurred prior to construction of the retention basin." The best way to restore conditions to pre-pond state "[w]ould be to remove the pond."

In its statement of decision, the trial court found "[d]efendants elected to locate the basin near the boundary line and in close proximity to the nearest residential building on [Aspen Grove's] adjoining, downhill real property. The evidence showed that alternative sites were available on defendants' land. No ground water level tests were performed at the site nor other appropriate (geotechnical) investigations before construction of the basin." The trial court further found "there was extensive and sufficient evidence introduced by [Aspen Grove] to support the element of proximate cause, including ground water test data at various locations, testimony of numerous witnesses (percipient and expert), many photographs and other documents as to the observed water conditions on the property before and after construction of the subject basin. The evidence arising from the recent event occurring in October 2011, was probative as well as the changes and damages in and around [Aspen Grove's] building foundations, certain parking and driveway areas and as to the death of numerous fir and aspen trees down-gradient of the basin."

On the issue of whether Aspen Grove was entitled to have the retention basin removed, the trial court found: "The evidence established at least three (3) separate and successive modifications to the newly developed drainage diversion system and the infiltration basin by defendants in 2005, 2007 and 2008. Each of the modifications were designed and installed by defendants, or their affiliated entities and contractors, to remedy and abate the recurring water seepage and migration of water from the basin onto plaintiff's down-gradient real property. All three successive modifications were of

9

different designs, including an increase in the holding capacity of the infiltration basin, construction of a bio-swale, a low-flow drainage system, installation of a receptor drain and a subsurface infiltration system. None of the three modifications effectively abated or stopped the seepage or migration of water from the infiltration basin onto [Aspen Grove's] downhill property, and the surcharge of the ground water levels thereon. It is notable that none of the three designed modifications included removal of the infiltration basin or any change in the location of the basin. In the court's opinion, such evidence is convincing and supports [Aspen Grove's] request for a mandatory injunction to remove the infiltration basin. [¶] Further, the evidence showed alternative sites for the infiltration basin or other infiltration facilities on the real property of defendants CNL and Trimont, including a subsurface infiltration facility at other locations, or storm water filter or retention basin at the golf course or other location."

The trial court granted a permanent injunction requiring CNL to remove the retention basin by concluding: "In light of the nature of the property herein, the continuing water seepage and invasion of [Aspen Grove's] down gradient real property from the basin and resulting damages, and to avoid the possibility of a multiplicity of judicial actions, the court finds that irreparable harm has been established."

**B.**

*Adequacy of Legal Remedies*

CNL argues the interceptor trench is part of an adequate remedy because "Aspen Grove's own evidence is that installation of an interceptor trench [would] stop 'all possible water from the retention basin' from reaching the Aspen Grove development." This assertion does not reflect the record accurately. Indeed, cross-examination by CNL's own counsel elicited the following concerns of Tom Crosby, Aspen's engineering geologist, who testified: "The problem with a cutoff trench is it may remove the water from above the pressure head, can go underneath the collection trench and come out still down below or it could go around." Crosby elaborated, "my concern is that the

10

collection trench may not be effective and may not return the area back to its original condition if you still have a retention basin in the area." Crosby also rejected the idea additional "defensive drains" around Aspen Grove buildings would "completely stop the water." The interceptor trench did not offer any kind of certainty in stopping the flow of water from the retention basin.

What is certain about the interceptor trench is it would largely or exclusively be built on Aspen Grove's property. CNL has no prerogative to divert the natural flow of water onto Aspen Grove's property and to constrain Aspen Grove to alter its property in an effort to ameliorate the intrusion. (*Keith v. Superior Court* (1972) 26 Cal.App.3d 521, 524.) *Keith* involved a plaintiff who owned two homes surrounded by property belonging to defendant. (*Id.* at p. 523.) To fulfill a requirement imposed by the City of Los Angeles on defendant's plan to develop its property, defendant was going to construct a retention basin over the easement used by plaintiff to access the homes. (*Ibid.*) The trial court refused to grant plaintiff a preliminary injunction to prevent construction of the retention basin. (*Ibid.*) The Court of Appeal issued a writ of mandate compelling the trial court to grant the injunction because the lack of injunctive relief "would leave defendant free to rip up plaintiffs' road and construct a retention basin in its place. At the end of the trial, the court would be required to choose between a mandatory injunction, requiring defendant to restore the premises at great expense, or limit plaintiffs' recovery to monetary damages. To refuse an injunction in such a situation would be to give defendant a private right of eminent domain." (*Id.* at p. 524.)

CNL proposes a remedy that similarly would give it a private right of eminent domain by requiring Aspen Grove to construct a deep trench of hundreds of linear feet on its property. CNL has no such prerogative to compel Aspen to accept such a de facto encroachment of both diverted waters and a deep trench on its land.

Moreover, the right to an injunction in a case involving a trespass irreparable in character and of a continuing nature "does not depend upon the extent of the damage

11

measured by a money standard." (*Allen v. Stowell* (1905) 145 Cal. 666, 668 (*Allen*).) *Allen* involved defendants who built dams on their properties to correct a mistake of a railroad company in locating its culverts. (*Id.* at p. 667.) The dams resulted in water being directed from its natural course and onto plaintiff's grove of orange trees. (*Id.* at p. 668.) The California Supreme Court held that "[t]o thus wrongfully cause water to flow upon another's land which would not flow there naturally is to create a nuisance per se." (*Id.* at p. 669.) Moreover, this nuisance per se "was quite sufficient" to warrant the trial court's mandatory injunction to remove the dams because "[a] trespass irreparable in its character and of a continuing nature may be restrained by a mandatory injunction, thus restoring things to their original condition." (*Id.* at pp. 668-669.) Here too, the continuing nature of the trespass caused by the retention basin was properly addressed by an injunction compelling CNL to remove the retention basin.

CNL attempts to distinguish *Allen, supra,* 145 Cal. 666 on grounds the retention basin in this case did not divert naturally flowing water. This assertion is undermined by the express finding of the trial court that "[t]he natural drainage of the development area was changed as part of the expansion project through a drainage system that diverted storm and snow runoff from approximately 149 acres of developed property to the infiltration basin." Moreover, "the evidence showed continuous or recurring water seepage or migration from the infiltration basin situate on defendant's uphill property . . . that continued to invade [Aspen Grove's] down-gradient real property from 2004 until the time of trial."

The trial court also rejected CNL's attempt to attribute the water damage to Aspen Grove from a source other than the retention basin. On this point, the trial court found: "The argument that the source of the water invasion was from a spring or wetland area on [Aspen Grove's] land was not supported by sufficient evidence. It is also notable that defendants' contention is inconsistent with the evidence of the three successive remedial measures and modifications to defendants' drainage system undertaken by defendants

12

after 2004, and the implication of liability that arises therefrom." CNL does not challenge the sufficiency of the evidence in support of these findings, which clearly establish the retention basin was part of a water diversion plan that resulted in irreparable and continuing damage to Aspen Grove's property.

Regardless of the measure of monetary damages to Aspen Grove's property, CNL may not force "an invasion of the property rights of one private party to serve the convenience or necessities of another private party." (*Felsenthal v. Warring* (1919) 40 Cal.App. 119, 131.) "Such a principle, if once adopted by judicial tribunals . . . would, in its practical operation, result in a system of judicial condemnation of the property of one citizen to answer an assumed necessity or convenience of another citizen, and the sacred right of private property . . . would become but a shadowy unsubstantiality." (*Ibid.*) Here, the invasion of Aspen Grove's land by a continuous overflow of water from the retention basin was properly addressed by the trial court in the form of an injunction requiring removal of the retention basin.

## C.

### *Removal of Retention Basin*

CNL contends the retention basin "performs an important function, serving the strong public interest in maintaining clean water." Claiming the retention basin is successfully carrying out its "function . . . to restore water quality, collecting the village runoff so it will cleanse itself as it infiltrates into the groundwater system below the basin." Touting the salutary effects of the retention basin, CNL argues the trial court's injunction to remove the basin was "overly broad." We reject the argument.

Whether Northstar Village and the surrounding environment will benefit from having a retention basin is an entirely different question from the question of whether the retention basin should have been dug immediately uphill from Aspen Grove. As the United States Supreme Court once observed, "[a] nuisance may be merely a right thing in the wrong place, like a pig in the parlor instead of the barnyard." (*Euclid v. Ambler*

13

*Realty Co*. (1926) 272 U.S. 365, 388 [71 L. Ed. 303].)  Here, the trial court found that "defendants elected to locate the basin near the boundary line and in close proximity to the nearest residential building on [Aspen Grove's] adjoining, downhill real property. The evidence showed that alternative sites were available on defendants' land."

CNL does not challenge the trial court's finding alternative sites were available, and presumably remain available, for the retention basin.  Instead, CNL characterizes the order to remove the basin as "overly broad."  Yet, CNL does not appear to be arguing it should be allowed to shrink the size of the retention basin, use it only intermittently, or even that it is prohibited from building another retention basin elsewhere.

Instead, CNL seems to contend the benefits of the pond to Northstar Village outweigh the toll on Aspen Grove.  To this end, CNL asserts "[t]here is no evidence that continued use of the infiltration pond will inevitably result in irreparable injury."  This assertion rests on a misreading of the record.  As the trial court found:  "According to the evidence, the damages incurred by [Aspen Grove] include deterioration of foundations of various residential buildings, damage to improved surfaces of certain parking areas and driveways as well as the death and loss of numerous fir and aspen trees located down-gradient of the infiltration basin on defendants' property in close proximity to [Aspen Grove's] adjoining real property."  Further, the trial court found that "[i]n light of the nature of the property herein, the continuing water seepage and invasion of [Aspen Grove's] down gradient real property from the basin and resulting damages, and to avoid the possibility of a multiplicity of judicial actions, the court finds that irreparable harm has been established."  Whatever its benefits, the retention basin is located in the wrong place.

Contrary to CNL's assertion, the mandatory injunction does not have the effect of "shutting down an entire legal business."  The trial court's injunction to remove the retention basin from its current location does not prevent CNL from constructing another retention basin in a location that does not impair the property rights of Aspen Grove or

14

identifying yet another solution. Thus, we reject CNL's reliance on cases in which injunctions effectively shut down lawful businesses. (*Anderson v. Souza* (1952) 38 Cal.2d 825, 843 [plaintiffs "sought to close the airport" by seeking injunctive relief for low flying aircraft]; *Morton v. Superior Court of San Mateo County* (1954) 124 Cal.App.2d 577, 581 [holding an injunction was "much too broad in that it prohibit[ed] the operation of [an otherwise lawful quarry that generated excessive noise and dust] and does not give the defendants the alternative of correcting the manner of their operations"].) CNL is in the business of running a ski resort, not a retention basin. The trial court's injunction does not restrain CNL from operating its lawful business.

CNL contends the injunction is overbroad on the basis of *Thompson v. Kraft Cheese Co.* (1930) 210 Cal. 171, 176 (*Thompson*). In *Thompson*, a dairy manufacturer discharged waste liquids from a factory into a branch of Nicasio Creek with the effect of sickening plaintiff's herd of pigs. (*Id.* at p. 173.) The problem was not remedied and the trial court granted injunctive relief. The California Supreme Court concluded, "the injunction is too broad in its provision restraining them from discharging or permitting to escape '*any* dirty water, sour milk, slops, refuse, offal, or other liquid or semi-liquid matter.' The vice of this provision is that it ignores the question of actual injury, and is framed so as to cover the slightest discharge, whether it causes any substantial pollution of the stream or not. It should have been limited to prohibiting such discharge as would cause substantial injury to the party seeking relief." (*Id.* at p. 176.) The *Thompson* court explained, "Where the decree absolutely prohibits any acts, there should be abundant evidence that the continuance of the acts will inevitably result in irreparable injury." (*Id.* at p. 180.)

The injunctive relief granted in this case passes muster under *Thompson*, *supra*, 210 Cal. 171. The trial court found Aspen Grove would suffer irreparable injury if the retention basin were allowed to remain in its current location. CNL does not suggest the trial court should have allowed a smaller basin or limited duration of use. Instead, CNL

15

wants the retention basin to remain as is.  The statement of decision clearly establishes the retention basin is a nuisance per se.  Notably, the trial court's injunction does not prevent CNL from regaining the same functionality in a different location by another retention basin.  The trial court's permanent injunction is not overbroad.

### DISPOSITION

The judgment is affirmed.  Aspen Grove Condominium Association shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


      HOCH     , J.


We concur:


  NICHOLSON  , Acting P. J.


     ROBIE    , J.

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| ASPEN GROVE CONDOMINIUM ASSOCIATION, | C073530 |
| Plaintiff and Respondent, | (Super. Ct. No. SCV0023959) |
| v. | |
| CNL INCOME NORTHSTAR LLC et al., | |
| Defendants and Appellants. | ORDER FOR PUBLICATION |

APPEAL from a judgment of the Superior Court of Placer County, Lloyd Von Der Mehden, Judge. Affirmed.

JAY-ALLEN EISEN LAW CORPORATION, Jay-Allen Eisen and Aaron S. McKinney; SPROUL TROST, Thomas G. Trost, Jason M. Sherman and Lisa A. Miller for Defendants and Appellants.

STOEL RIVES, Michael B. Brown and Tamara L. Boeck for Plaintiff and Respondent.


The opinion in the above entitled matter, filed on October 3, 2014, was not certified for publication in the Official Reports. For good cause it now appears the opinion should be published in the Official Reports and it is so ordered.

FOR THE COURT:


    NICHOLSON    , Acting P. J.


     ROBIE     , J.


     HOCH    , J.